# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.,*<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff,<br>v.<br><br>HON. PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of Puerto Rico,<br><br>Defendant. | Adv. Proc. No. _____ in 17 BK 3283-LTS |

## FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S COMPLAINT IN RESPECT OF ACT 41-2022 AGAINST THE GOVERNOR OF <u>PUERTO RICO</u>

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523 (LTS)) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**To the Honorable United States District Judge Laura Taylor Swain:**

Plaintiff the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), for itself and as Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), brings this complaint against defendant Pedro Pierluisi Urrutia (the "Governor" or "Defendant").

## NATURE OF THE ACTION

1.      The Oversight Board brings this action to nullify Act 41-2022 (formerly House Bill 1244-2022, hereinafter "Act 41" or the "Act").  Act 41 repeals critical labor reforms and adds new employment law requirements that negatively impact labor market flexibility, in direct contravention of express provisions in the certified Commonwealth fiscal plans.  In doing so, Act 41 discourages new job creation, thereby reducing employment and labor force participation on the Island, negatively impacts investment, reduces overall economic growth, and reduces Commonwealth revenues.  The Oversight Board and numerous Commonwealth fiscal plans have required that the Puerto Rico Government (the "Government") not reverse labor reforms that were enacted in 2017.  The Oversight Board also repeatedly directed the Government not to enact Act 41 and attempted to engage the Government in a dialogue about the severe negative impacts of Act 41—to no avail.

2.      Since 2017, the Oversight Board has consistently asserted that significant labor reform is a key element for Puerto Rico to achieve fiscal responsibility and access to the capital markets.  For example, soon after its establishment, the Oversight Board observed that if the Commonwealth established at-will employment on the Island, as is the case in 49 of the 50 United States, the Commonwealth would experience significant economic growth.  The Commonwealth refused to do so and, as a result, has foregone the significant economic benefits and increased

revenues from additional employment and investment encouraged by a change in the law, thereby harming its residents and creditors.

3.      Instead, the Government limited its labor reforms to Act 4-2017, known as the Labor Transformation and Flexibility Act (the "LTFA"). A true and correct copy of the LTFA is attached hereto as Exhibit 1. While these reforms created meaningful benefits for the Commonwealth's economy, the Commonwealth's certified fiscal plans repeatedly observed that the LTFA did not go far enough because Puerto Rico's growth rate and labor force participation rate remained very low. For example, numerous fiscal plans, including the 2022 certified Commonwealth Fiscal Plan (the "2022 Fiscal Plan"), state as follows:

> **The [LTFA] did not go nearly as far as needed to eliminate the most egregious elements of Act 80 of 1976, also known as the Unjust Dismissal Act. However, [the LTFA] did, to some extent, ease some restrictions on labor hiring. While some stakeholders have called for the repeal of [the LTFA], its elimination would likely reestablish onerous provisions related to probationary periods, overtime, and bonuses, which would all make the hiring environment more costly in the formal sector. Its repeal would discourage new hiring and reduce the labor market flexibility, thus limiting the effectiveness of the [Earned Income Tax Credit] expansion in promoting labor force participation, economic growth, and the revenues associated with that growth.**

*E.g.*, 2022 Fiscal Plan at 86 (emphasis added), a true and correct copy of which is attached hereto as Exhibit 2. Based on the foregoing, and precisely because the LTFA did not go far enough, the 2022 Fiscal Plan concluded: "**[t]he Government must refrain from repealing [the LTFA] or enacting new legislation that negatively impacts labor market flexibility**." *E.g.*, *id.* (emphasis added).

4.      The Government openly violated the 2022 Fiscal Plan in enacting Act 41 because it does precisely what the certified Fiscal Plan prohibits. By reversing critical labor reforms in the LTFA and adding new employment law requirements that negatively impact labor market

flexibility, Act 41 discourages employment on the Island and will have a negative impact on investment, labor force participation, and Commonwealth revenues.  Among other things, the Act creates new employee benefits, decreases the thresholds for accruing sick and vacation benefits as well as qualifying for Christmas bonuses, and increases the costs and risks for employers when terminating employees.

5.     By enacting Act 41, the Government disregarded (*i*) the express terms of the Fiscal Plan, (*ii*) the advance warnings from the Oversight Board that it determined the Act would impair and/or defeat the purposes of the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241 ("PROMESA"), and (*iii*) the requirements of PROMESA.

6.     This action requests declaratory and injunctive relief pursuant to PROMESA.  In contravention of PROMESA's requirements and the Oversight Board's determinations and warnings, the Puerto Rico Legislature enacted, and the Governor signed into law, Act 41.  Act 41 undoes the LTFA and reinstates the restrictive labor environment that existed before the LTFA's passage of crucial labor reforms, and imposes new restrictions and requirements on employers. By reversing labor reform advances that were previously enacted, Act 41 discourages new hiring and reduces labor market flexibility, which will cause a significant adverse economic impact on the Commonwealth's economy and revenues, in direct contravention of the 2022 Fiscal Plan.  In the determination of the Oversight Board, which is based on the analysis of its economist, Act 41 impairs and/or defeats PROMESA by, among other things, repealing labor reforms the 2022 Fiscal Plan expressly directs not be undone, and doing so without assessing the law's impact on the Commonwealth's revenues.

7.     Prior to the enactment of Act 41, the Oversight Board informed the Governor of its determination that Act 41 impairs and/or defeats the purposes of PROMESA, and notified the

Governor that he was barred from signing Act 41 into law under PROMESA § 108(a)(2).  The Governor disregarded the notice and signed Act 41 into law, in violation of PROMESA.

8.      Following the enactment of Act 41, the Oversight Board made significant efforts to engage with the Government to understand its views and to explain the Oversight Board's concerns.  In response, the Government admitted it did not prepare any estimate—much less the required "formal estimate"—of Act 41's impact on the Commonwealth's revenues, claiming doing so would be too "complex and difficult."

9.      Given that Act 41 impacts the entire private sector workforce and, as a consequence, the entire economy of the Commonwealth, the Government's decision not to prepare an estimate of the law's impact on the Commonwealth's revenues is not merely reckless, it is fiscally irresponsible and directly contrary to PROMESA.

10.     Moreover, the Government's explanation that it would be too "complex and difficult" to prepare a formal estimate does not stand up to scrutiny.  The Oversight Board engaged its own economist, who analyzed Act 41 and concluded Act 41 will have a significant negative impact on the economy and will reduce Commonwealth revenues.

11.     The Oversight Board even shared the analysis of its economist with the Government, in an effort to spark a dialogue and ideally to cause the Government to undertake its own economic analysis of Act 41.  The Government rebuffed these efforts and has never provided either an economic analysis of Act 41 or any estimate of its impact on the revenues of the Commonwealth.

12.     The Government initially enacted Act 41 believing it would be powerless to suspend it because Act 41 is primarily enforced by private parties; specifically, employees.  Then, in response, the Oversight Board offered the Government a means of suspending Act 41 so as not

to violate PROMESA § 108(a)(2). But, the Government refused to take action to suspend the Act by entering into a Court-approved stipulation suspending it, so the Oversight Board and Government could engage in a full dialogue about the Act and avoid litigation.

13. As a result of the Government's intentional actions to violate PROMESA § 108(a)(2) and intentional failures to rectify the violations, the Oversight Board brings this action to have Act 41 declared a nullity.

## PARTIES

14. Plaintiff, the Oversight Board, is an entity within the Commonwealth Government established pursuant to PROMESA § 101.

15. Defendant Pedro Pierluisi Urrutia is the Governor of Puerto Rico, vested with the executive power and the obligation to execute the laws. P.R. Const. art. IV §§ 1, 4.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under PROMESA, a federal statute, and pursuant to PROMESA §§ 106(a) and 306(a)(2), Section 91.1(k) of the confirmed Plan,[1] and decretal paragraph 83 of the Confirmation Order,[2] because the action arises out of PROMESA and relates to the Commonwealth's Title III case, as Act 41 violates decretal paragraphs 25 and 79 of the

---

[1] "Plan" refers to the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, dated January 14, 2022, Case No. 17-03283-LTS [ECF No. 19784].

[2] "Confirmation Order" refers to the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, dated January 18, 2022, Case No. 17-03283-LTS [ECF No. 19813].

Confirmation Order and impairs the Commonwealth's ability to meet its obligations pursuant to the Plan.

17.    This Court has personal jurisdiction over Defendant pursuant to PROMESA § 306(c) and because he is the Governor of Puerto Rico, is located in Puerto Rico, and has performed acts in Puerto Rico giving rise to the claims in this action.

18.    Venue is proper in this District pursuant to PROMESA §§ 106(a) and 307.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because the Defendant resides in the District and because a substantial part of the events or omissions giving rise to the action occurred in the District.

## **FACTUAL BACKGROUND**

A.    **HISTORIC EFFORTS TO STIMULATE PUERTO RICO'S ECONOMY THROUGH LABOR REFORM:  THE 2017 LABOR TRANSFORMATION AND FLEXIBILITY ACT**

19.    On January 26, 2017, then-Governor Ricardo Antonio Rosselló Nevares signed the LTFA into law.

20.    The LTFA was enacted with the goal of stimulating Puerto Rico's economy through provisions intended to attract new business to the Commonwealth, while also easing regulatory labor burdens for existing businesses on the Island in an effort to promote additional economic activity and hiring.  The law states it was intended to be an initial step in the process of reforming Puerto Rico's labor laws to better meet "the demands of the global markets" and to "promote [] economic development and become more competitive."  LTFA at Statement of Motives.  The LTFA states it was designed to "attract foreign investment, help local business owners to create jobs, and allow thousands of Puerto Ricans to enter the workforce."  *Id.*

21.    Specifically, through the LTFA, the Government sought to advance the objectives of:  (*i*) "restoring economic growth and creating a more competitive economy" and

(*ii*) "restructuring the Government to achieve balanced budgets, while preserving essential services for the People of Puerto Rico," among others. *Id.* at 4-5.

22.     One of the goals of the LTFA was to amend Act 80 of May 30, 1976 ("Act 80" or "Law 80") to allow for greater flexibility and dynamism in the Puerto Rican economy through labor reforms.  Act 80 imposes more labor restrictions on Puerto Rican businesses than those found in any state in the United States.  The LTFA loosened many of Act 80's restrictions, including: (*i*) reducing the statute of limitations for claims covered by Act 80 from three years to one year; (*ii*) increasing the probationary period in which new employees may be discharged without "just cause" or the payment of severance from three months to twelve months for employees classified as executives, administrators, or professionals under the Fair Labor Standards Act ("FLSA"), and to nine months for all other employees; (*iii*) reversing the burden of proof in dismissal actions so the employee, instead of the employer, is required to prove their dismissal was unjustified; and (*iv*) revising the formula for calculating severance pay for unjust termination.

23.     The LTFA also modified other employment law provisions, including establishing slower accrual rates for both vacation days and sick leave and increasing the work hours required for Christmas bonus eligibility, as part of its effort to stimulate economic growth through improved hiring and increased job creation.

**B.     THE COMMONWEALTH FISCAL PLANS HIGHLIGHT THE OVERSIGHT BOARD'S LONGSTANDING FOCUS ON FLEXIBILITY IN THE LABOR MARKET**

24.     Each fiscal plan the Oversight Board has certified for the Commonwealth acknowledges the many challenges Puerto Rico has faced, and continues to face, including recovering from multiple natural disasters and the ongoing COVID-19 global pandemic.  To overcome these challenges, the fiscal plans provide a method for the Commonwealth to achieve fiscal responsibility and access to the capital markets by, among other things, undertaking fiscal

measures and implementing structural reforms, including human capital, welfare, and labor reform. Though the specific requirements have evolved over time (in part due to the Government's failure to institute measures and reforms included in various fiscal plans), human capital, welfare, and labor reform have been critical components of each certified fiscal plan.

**2017 Fiscal Plan**

25.     The March 13, 2017 certified Commonwealth Fiscal Plan (the "2017 Fiscal Plan")—the first fiscal plan certified by the Oversight Board—identified structural reforms to generate an increase in GNP, including measures to increase labor participation. Such reforms included "measures aimed to attract new businesses, create new employment opportunities, and foster private sector employment growth to increase labor demand" and "welfare and labor incentives to encourage greater sector participation thus increasing labor supply." 2017 Fiscal Plan at 24, a true and correct copy of which is attached hereto as Exhibit 3.

**2018 Fiscal Plans**

26.     The April 19, 2018 certified Commonwealth Fiscal Plan (the "April 2018 Fiscal Plan") identified Puerto Rico's low formal labor force participation rate as a key challenge to improving its fiscal and economic trajectory. April 2018 Fiscal Plan at 34, a true and correct copy of which is attached hereto as Exhibit 4.

27.     The April 2018 Fiscal Plan states "increasing labor force participation may be the single most important reform for long-term economic well-being in Puerto Rico." *Id.* at 34. The April 2018 Fiscal Plan therefore proposed a labor reform package to increase the labor force participation rate and boost the Puerto Rican economy.[3] *Id.* at 42-44. The April 2018 Fiscal Plan

---

[3] The April 2018 Fiscal Plan was "built on the assumption that, by no later than May 31, 2018, the Legislative Assembly of Puerto Rico will pass the Labor Reform Package and present it to the Governor of Puerto Rico for his signature." April 2018 Fiscal Plan at 42.

specifically targeted "generous mandated employer benefits" for reform.  *Id.* at 34.  Such benefits included the rate of accrual of mandatory sick leave and paid vacation, as well as the size of the mandatory "Christmas bonus."  *Id.* at 42.  The April 2018 Fiscal Plan cited studies demonstrating that "when employers are required to provide an employee benefit, those employers will tend to recoup the costs of those benefits by reducing the wages paid to employees," or, "[w]hen employers are prevented from reducing wages to offset costs of mandated benefits . . . they may choose to reduce the number of workers they hire."  *Id.* at 34–35.  The April 2018 Fiscal Plan concluded "it is reasonable to assume that Puerto Rico's high levels of mandated employer-paid benefits reduce both wages and employment relative to a scenario in which such [mandatory employer-provided] benefits were not required."  *Id.* at 35.

28.     The April 2018 Fiscal Plan also targeted for reform Puerto Rico's "just cause" dismissal regime, where "employers generally must first prove 'just cause' before dismissing employees."  *Id.*  The April 2018 Fiscal Plan explained this regime "makes it more costly and risky not only to dismiss, but also to hire, an employee."  *Id.*

29.     The April 2018 Fiscal Plan recognized the LTFA's implementation of improvements to labor market conditions, which "added flexibility to overtime regulations and increased work requirements to become eligible for Christmas Bonus and severance pay, among other reforms."  *Id.*  The April 2018 Fiscal Plan said "[n]otwithstanding such reforms, Puerto Rico's labor laws remain by far the most burdensome in the U.S."  *Id.*  The April 2018 Fiscal Plan stated Puerto Rico "must become an employment at-will jurisdiction, reduce mandated paid leave (including sick leave and vacation pay) by 50%, and make the Christmas Bonus voluntary for employers."  *Id.* at 38–39.

30.     The May 30, 2018 certified Commonwealth Fiscal Plan (the "May 2018 Fiscal Plan") built upon the labor reform package outlined in the April 2018 Fiscal Plan by requiring the repeal of Act 80 to allow for at-will employment.[4]  May 2018 Fiscal Plan at 39 ("To reduce the cost to hire and encourage faster job creation, including movement of informal jobs to the formal economy, Puerto Rico must become an employment at-will jurisdiction by repealing Law 80 . . . on or before June 27, 2018, which shall become effective on or before January 1, 2019.")  A true and correct copy of the May 2018 Fiscal Plan is attached hereto as Exhibit 5.

31.     The Government failed to act upon many of the labor reforms set forth in the April 2018 Fiscal Plan and the May 2018 Fiscal Plan.  *See* June 29, 2018 certified Commonwealth Fiscal Plan (the "June 2018 Fiscal Plan") at 39, a true and correct copy of which is attached hereto as Exhibit 6 ("Unfortunately, the Legislature has failed to pass the Labor Reform Package that was outlined in the April 19, 2018 version of the New Fiscal Plan.").  Nor did the Government repeal Act 80 as required by the May 2018 Fiscal Plan.  *Id.*  ("Unfortunately, the Legislature . . . failed to repeal Law 80 that was required by the May 30, 2018 version of the New Fiscal Plan.").

32.     The June 2018 Fiscal Plan identified the deleterious effects of the Government's failure to enact all the proposed reforms to Puerto Rico's labor market set forth in the April 2018 Fiscal Plan and the May 2018 Fiscal Plans.  *Id.*  It cited the Legislature's failure to pass the "most critical structural reform – turning Puerto Rico into an at-will employment jurisdiction," as the "biggest barrier to hiring in Puerto Rico."  *Id.* at 1, 35–36.  The June 2018 Fiscal Plan explained "the   Legislature's   demonstrated   noncompliance   with   the   comprehensive   labor   reform

---

[4] As stated in the May 2018 Fiscal Plan, Act 80 "instituted protections against wrongful discharge for Puerto Rican workers, and mandated severance for firms attempting to remove employees," making "Puerto Rico's labor market significantly more rigid and placed it out of step with the prevailing labor markets in the mainland."  May 2018 Fiscal Plan at 6.

requirements of previous fiscal plans has forced the removal of . . . projected revenues from the . . . Fiscal Plan.  As a result, the [June 2018] Fiscal Plan project[ed] that the human capital and welfare reforms that ha[d] been committed to will only generate 0.3% growth for the Island by FY23, rather than 1% growth." *Id.* at 39 (footnote omitted).

33.     In the October 23, 2018 certified Commonwealth Fiscal Plan (the "October 2018 Fiscal Plan"), the Oversight Board continued to push for "critical reforms," but again noted "there are some important reforms that are not included in this New Fiscal Plan because the political will to adopt them does not exist."  October 2018 Fiscal Plan at 7, a true and correct copy of which is attached hereto as Exhibit 7.  The October 2018 Fiscal Plan stated "[c]hief among these [reforms] is labor reform, which is essential to truly unlocking growth and prosperity for the Island and driving fiscal sustainability in the long-term." *Id.*  Accordingly, the October 2018 Fiscal Plan noted "while [the October 2018] Fiscal Plan provides for many actions that the Government of Puerto Rico must take, unless the Government commits to more ambitious reforms, Puerto Rico will not be able to overcome all of the problems that have plagued its economy for over a decade, and the Government will have lost a critical window of opportunity to restore long-term fiscal sustainability and achieve long-term economic growth and prosperity for the people of Puerto Rico." *Id.*

34.     The October 2018 Fiscal Plan made clear these labor reforms were designed to "improve labor market flexibility through repealing restrictive laws like Law 80 and creating labor conditions more similar to those on the mainland, which would lead to increased labor force participation rates." *Id.* at 43.  Nonetheless, the October 2018 Fiscal Plan recognized the "political will to drive labor market reform [including repealing Act 80, reducing paid leave, eliminating mandatory Christmas bonus, and establishing at-will employment] does not exist." *Id.* at 43.  The

October 2018 Fiscal Plan did observe, however, that the Puerto Rico Government agreed to enact *other* reforms to promote labor participation, such as an Earned Income Tax Credit ("EITC"),[5] and sought to work with the government to institute them. *Id.* at 43–45. The Fiscal Plan predicted, "[i]f implemented immediately, the structural reforms [were] projected to result in a sustained 0.95% annual increase to real GNP [gross national product] growth by [Fiscal Year] 2023," with about 0.15% of the growth coming from human capital and welfare reforms and 0.50% of the growth from ease of doing business reforms. *Id.* at 41.

**2019-20 Fiscal Plans**

35.     The May 9, 2019 certified Commonwealth Fiscal Plan (the "2019 Fiscal Plan") called for labor reforms and highlighted the fiscal benefits such reforms would offer. *E.g.*, 2019 Fiscal Plan at 51–52, a true and correct copy of which is attached hereto as Exhibit 8. The 2019 Fiscal Plan noted the "strides" made by the LTFA, "add[ing] flexibility to overtime regulations and increas[ing] work requirements to become eligible for Christmas Bonus and severance pay, among other reforms." *Id.* at 52. But it concluded "there is more work to be done" and again noted "[p]erhaps the biggest barrier to hiring in Puerto Rico is its lack of 'at-will employment.'" *Id.*

36.     The May 27, 2020 certified Commonwealth Fiscal Plan (the "2020 Fiscal Plan") noted the Commonwealth has, "at times, rejected the deadlines outlined in the Fiscal Plans." 2020 Fiscal Plan at 76, a true and correct copy of which is attached hereto as Exhibit 9. "[T]his has resulted in delayed implementation on most of the identified structural reforms," including "[r]efus[al] to pursue comprehensive private sector labor reform." *Id.* The 2020 Fiscal Plan

---

[5] The EITC, a tax credit designed to incentivize the labor force, rewards individuals with low to moderate incomes for working in the formal labor market by reducing those taxpayers' tax obligations and often generates a cash refund for the taxpayers.

estimated private sector labor reform measures (including repealing Act 80, reducing paid leave, and eliminating the Christmas bonus), if implemented, would add an additional 0.50% GNP growth over two years. *Id.* at 58. The 2020 Fiscal Plan noted "[e]fforts at private sector labor market reforms have stalled and the impact of human capital and welfare reform is not expected for several years." *Id.* at 10. The 2020 Fiscal Plan explained "labor force participation has not increased given the Government's refusal to pursue comprehensive private sector labor market reform," *id.* at 13 (emphasis removed), leaving the Commonwealth's "labor force participation rate…among the lowest in the world," *id.* at 11; *see also id.* at 39–40, 78. "Had the structural reforms [] been implemented at the pace and scale forecasted in the 2019 Fiscal Plan, the Government would have generated 0.14% in additional GNP uptick, worth another $10 billion in tax revenues by FY2049. This shortfall is even more pronounced relative to the structural reform impact forecasted in the April 2018 Fiscal Plan, whereby the Government would have generated 1.18% in additional GNP uptick, worth another $66 billion in tax revenues by FY2049." *Id.* at 76-77.

**2021-22 Fiscal Plans**

37.     The Oversight Board certified fiscal plans for the Commonwealth on April 23, 2021 (the "2021 Fiscal Plan") and on January 27, 2022. A true and correct copy of the 2021 Fiscal Plan is attached hereto as Exhibit 10. Like the plans certified before them, the 2021 Fiscal Plan and the 2022 Fiscal Plan contemplate fiscal measures and structural governmental reforms, including human capital, welfare, and labor reform. 2021 Fiscal Plan at 10–13; 2022 Fiscal Plan at 15–16. Both fiscal plans also noted the lost tax revenues resulting from delaying implementation. 2021 Fiscal Plan at 72–73; 2022 Fiscal Plan at 77–78. Still, the 2021 Fiscal Plan estimated, if implemented, structural reforms would "collectively generate an

invaluable 0.75% GNP uptick by [Fiscal Year] 2026, as well as 0.90% in total GNP growth and more than $30 billion in additional Commonwealth revenues by [Fiscal Year] 2051." 2021 Fiscal Plan at 73.  The 2022 Fiscal Plan made similar estimates.  2022 Fiscal Plan at 78.

38.     With respect to the LTFA, both the 2021 Fiscal Plan and the 2022 Fiscal Plan recognize that, although it did not go far enough, it "did to some extent ease some restrictions on labor hiring." 2021 Fiscal Plan at 79; 2022 Fiscal Plan at 86.

39.     The 2021 Fiscal Plan and 2022 Fiscal Plan further state the repeal of the LTFA "would discourage new hiring and reduce the labor market flexibility, thus limiting the effectiveness of the EITC expansion in promoting labor force participation, economic growth, and the revenues associated with that growth." 2021 Fiscal Plan at 79; 2022 Fiscal Plan at 86.  For this reason, the Fiscal Plans make clear "the Government **must refrain from repealing Act 4-2017 or enacting new legislation that negatively impacts labor market flexibility**." 2021 Fiscal Plan at 79 (emphasis added); 2022 Fiscal Plan at 86 (emphasis added).

40.     Given the express language in each of the certified fiscal plans between 2017 and the present, the Government has been on notice for years about the critical role of labor market reform in the Oversight Board's plans for promoting economic growth and associated Government revenues and that the LTFA is a crucial first step towards that end.

C.     **THE GOVERNMENT'S ATTEMPT TO MODIFY THE LTFA VIA HOUSE BILL 3**

41.     In the spring of 2021, the Puerto Rico House of Representatives introduced House Bill 3-2021 ("HB 3").  HB 3 sought to roll back the LTFA's reforms and was a precursor to Act 41.

42.    In response, the Oversight Board retained Robert K. Triest, PhD, Chair of the

Economics Department at Northeastern University, to advise the Board on the effects of HB 3 on

the Commonwealth's labor market and the Commonwealth's economy.

43.    On June 25, 2021, after consultation with Dr. Triest, the Oversight Board sent a

letter notifying the Governor, the President, and the House Speaker of the Oversight Board's

determination that HB 3:

> [I]f enacted, would be significantly inconsistent with the Fiscal Plan
> in violation of PROMESA section 204(a), and would impair and
> defeat the purposes of PROMESA in violation of section 108(a)(2).
> Indeed, the Bill seeks to repeal labor reforms the Fiscal Plan
> expressly directs not be undone.  It thereby discourages new
> investment by making it less attractive and more burdensome.  This
> harms the economy today and future growth.  Accordingly, [HB 3]
> must not be enacted.  PROMESA section 108(a)(2) bars its
> enactment and implementation.

June 25, 2021 letter at 3, a true and correct copy of which is attached hereto as Exhibit 11.

44.    Notwithstanding the Oversight Board's June 25, 2021 letter, the Senate passed

HB 3 on February 7, 2022.  A certified translation of HB 3 is attached hereto as Exhibit 12.

45.    On February 11, 2022, the Oversight Board conducted a meeting at which HB 3

was discussed, including analysis by Dr. Triest.  Dr. Triest's analysis concluded that HB 3 would

reduce labor market flexibility, the labor force participation rate, economic growth and market

competition.

46.    The Governor vetoed HB 3 on March 4, 2022.  However, in connection with his

veto, the Governor expressed his support for HB 3's purposes—to "reverse[] the harm caused by

this unfortunate labor reform of 2017 [*i.e.*, the LTFA]"—and encouraged the legislature to pass a

new law with certain changes.  A certified translation of the Governor's March 4, 2022 Veto

Explanation is attached hereto as Exhibit 13.  The Governor's remarks were directly contrary to

the January 2022 Fiscal Plan.

### D.    ACT 41-2022

47.    Less than a week after the Governor vetoed HB 3 and in accordance with the Governor's desire to reverse aspects of the LTFA, the House passed House Bill 1244-2022 ("HB 1244") on March 10, 2022.  HB 1244 contained many of the same provisions found in HB 3.

48.    The Oversight Board analyzed HB 1244 and consulted with Dr. Triest.  Based on that analysis and consultation with Dr. Triest, on March 18, 2022, the Oversight Board issued a resolution:  (*i*) "[d]irect[ing] the Senate not to pass HB 1244;" (*ii*) "[d]irect[ing] the Governor not to enact HB 1244;" (*iii*) "[d]irect[ing] the Government not to implement HB 1244;" (*iv*) "[advising] that the Government is barred by PROMESA section 108(a)(2) from enacting, implementing, and enforcing HB 1244;" and (*v*) "[a]pprov[ing] the taking [of] legal action against the Government and other appropriate parties, pursuant to its authority under PROMESA, including section 104(k), to enforce the bar against enacting, implementing, and enforcing HB 1244 and have it declared a nullity, to prevent further harm to the Commonwealth and its citizens and to carry out PROMESA."  A true and correct copy of the Oversight Board's March 18, 2022 Resolution Relating to HB 1244 is attached hereto as Exhibit 14.

49.    On March 22, 2022, the Oversight Board filed its Status Report in Connection with the March 23–24, 2022 Omnibus Hearing, *see* Case No. 17-03283 [ECF No. 20428], in which the Oversight Board informed the Court "with the Governor's urging, the Legislature continues to propose and pass bills (*i.e.*, HB 1244) the Oversight Board has determined would impair or defeat the purposes of PROMESA, such as a bill that would exacerbate the Commonwealth's current labor law disallowing termination of employment at will even when there is no discrimination or other illegal motive."  *Id*. at 4.

50.    In that filing, the Oversight Board shared its concern that then-HB 1244 "may substantially deter investment in Puerto Rico and all the jobs and economic growth and prosperity it would create for the people." *Id.* at 4–5.  The Oversight Board noted that, "[i]f contrary to PROMESA section 108(a)(2), these bills become laws, the Oversight Board will consider taking appropriate action." *Id.* at 5.

51.    On June 2, 2022, the Senate passed HB 1244 with minor amendments to the House version, and on June 7, 2022, the House approved the Senate's version of HB 1244 ("Amended HB 1244").  A true and correct copy of Amended HB 1244 is attached hereto as Exhibit 15.

52.    On June 10, 2022, after further consultation with Dr. Triest, the Oversight Board passed a "Resolution Relating to Amended HB 1244" (the "June Resolution").  A true and correct copy of the June Resolution is attached hereto as Exhibit 16.  In the June Resolution, the Oversight Board determined Amended HB 1244, would, like its prior version:  impair and/or defeat PROMESA's purposes, including of ensuring fiscal responsibility and achieving access to capital markets, by discouraging new hiring and reducing labor market flexibility in direct contravention of the Fiscal Plan, which in turn will (*i*) negatively impact Puerto Rico's dismal labor force participation rate; (*ii*) reduce economic growth and market competition; (*iii*) deprive the Commonwealth of the revenues associated with such revenue growth (including by reducing the effectiveness of the EITC); and (*iv*) increase the Commonwealth's public assistance burden.

53.    By letter dated June 13, 2022 (the "June 13 Letter"), the Oversight Board informed the Governor, the Senate President, and the House Speaker of the Oversight Board's determination that Amended HB 1244, if enacted, would be significantly inconsistent with the Fiscal Plan in violation of PROMESA § 204(a), and would impair and defeat the purposes of PROMESA in violation of § 108(a)(2).  June 13 Letter at 3, a true and correct copy of which is attached hereto as

Exhibit 17.  In that letter, the Oversight Board urged the Governor not to sign Amended HB 1244 into law.  *Id.*

54.     Notwithstanding the Oversight Board's June 13 Letter, the Governor signed HB 1244 into law as Act 41 on June 20, 2022.  That same day, the Governor responded to the Oversight Board's June 13 letter.  A true and correct copy of the Governor's June 20, 2022 letter is attached hereto as Exhibit 18.  The Governor implicitly admitted the Government had not estimated the impact of Act 41 on the Commonwealth's revenues.  The Governor attempted to justify the failure to perform such an estimate by claiming it "would require a comprehensive economic study to assess whether it would negatively impact revenues in a manner that would render it significantly inconsistent." *Id.*

55.     Act 41 became effective initially with respect to certain employers starting on July 20, 2022 and thereafter with respect to smaller employers starting on September 18, 2022.

56.     Act 41 repeals portions of the LTFA and reestablishes many of the burdensome labor restrictions that existed prior to the passage of the LTFA.  In addition, Act 41 institutes new and onerous employment law requirements that have never existed in the Commonwealth, even before the LTFA was enacted.

57.     A summary of key provisions of Act 41, as compared to the LTFA and pre-LTFA legal landscape, is provided below:

| Provision | Prior to LTFA | LTFA Changes | Act 41 |
|---|---|---|---|
| **Leave Benefits for Part-Time Employees** | N/A | N/A | Provides for accrual of sick and vacation benefits for part-time (>20hr/wk) employees (Sec. 11)[6] |

---

[6] Section citations are to Act 41.  A certified translation of Act 41 is attached as Exhibit 19.

| Provision | Prior to LTFA | LTFA Changes | Act 41 |
|---|---|---|---|
| **Payment for Overtime Worked by Student Employees** | N/A | N/A | Provides that if an employee who works during a rest day is a student (defined as any person enrolled in a system of higher education, university education, or postgraduate education), the employer must pay double the regular rate of pay (or, for employers designated as micro, small, or medium-sized businesses under Act 62-2014, 1.5 the regular rate of pay) (Sec. 10) |
| **Hours to Accrue Sick/Vacation Days** | 115 hours worked in a month | 130 hours worked in a month | Reverts to 115 hours worked in a month (Sec. 11) |
| **Vacation Day Accrual Rate** | Vacation days accrue at rate of 1.25 day per month | Tiered process based on years of service (max = 1.25 days per month after 15 years of service) | Reverts to 1.25 days per month (15 days a year), but with a lower rate for employers with ≤ 12 employees (Sec. 11) |
| **Probation Period** | 3 months, with an extension of up to 3 months with Department of Labor sign-off | 9 months, 12 months for executives | Reverts to pre-LTFA period (3 months, with possibility of a 3-month extension) (Sec. 22) |
| **Threshold to Receive a Christmas Bonus** | More than 700 hours between October 1 of the previous year and September 30 of the current year | 1,350 hours (for employees hired after LTFA's enactment) | Reverts to pre-LTFA 700-hour threshold (and 900 hours for employers designated as micro, small, or medium-sized businesses under Act 62-2014) (Sec. 14) |
| **Presumption of Unjustified Dismissal** | Presumption that dismissal unjustified; Burden on employer to prove justified | Presumption that dismissal justified; Burden on employee to prove unjustified | Reverts to pre-LTFA presumption and burden (Sec. 23) |

19

| Provision | Prior to LTFA | LTFA Changes | Act 41 |
|---|---|---|---|
| Statute of Limitations for Actions Commenced by Employee | Various statutes of limitations ranging from 1-year to 3-years depending on the cause of action | 1-year for all causes of action | Reverts to 3-years for some causes of action (Secs. 2, 13, 24.) |

58.     The majority of the provisions of Act 41 summarized above were also present in the text of HB 3.  As such, the Legislature and the Governor were aware the provisions of Act 41 were directly contrary to the 2021 Fiscal Plan and the 2022 Fiscal Plan.  The Legislature and the Governor also openly disregarded the prior written notice from the Oversight Board that HB 3 and Act 41 impair and/or defeat the purposes of PROMESA, as determined by the Oversight Board. And while the Governor vetoed HB 3, the differences between key provisions of HB 3 and Act 41, which he signed into law, are minimal, as summarized in the chart below:

| Provision | HB 3 | Act 41 |
|---|---|---|
| Leave Benefits for Part-Time Employees | Creates sick and vacation day benefits for part-time (>20hr/wk) employees | Same as HB 3 |
| Hours to Accrue Sick and Vacation Days | Reverts to 115 hours work in a month | Same as HB 3 |
| Vacation Day Accrual Rate | Reverts  to 1.25 days per month (15 days a year) | Reverts  to 1.25 days per month (15 days a year), but with a lower rate for employers with ≤ 12 employees |
| Sick Day Accrual Rate | Accrues 1.25 days per month (15 days a year) | No change from accrual rate under LTFA |
| Probation Period | Reverts to pre-LTFA period (3 months), but with no possibility of extension | Similar to HB 3 in that it also reverts to 3 months, but allows possibility of an extension |

| Provision | HB 3 | Act 41 |
|---|---|---|
| **Threshold to Receive a Christmas Bonus** | Reverts to pre-LTFA 700-hour threshold | Same as HB-3 |
| **Presumption Of Unjustified Dismissal** | Reverts to pre-LTFA presumption that dismissal is unjustified and puts the burden on the employer to prove dismissal was justified | Same as HB 3 |
| **Statute of Limitations for Actions Commenced by Employee** | Reverts to 3-year for some causes of action | Reverts to 3-year for some causes of action, though fewer than HB-3 |
| **Payment of Overtime** | Reverts to pre-LTFA rate of 2x the regular hourly wage | No change from payment of overtime under LTFA |

59.    As the tables above illustrate, Act 41 imposes a host of new requirements on employers that discourage hiring.  If Act 41 is permitted to remain in effect, an employer seeking to hire a new employee is faced with the following new considerations:  (1) having to provide sick and vacation benefits that did not exist before for part-time employees, and greater levels of such benefits for full time employees; (2) a lower hours-worked threshold for having to pay the employee a Christmas Bonus; (3) a shorter window in which to evaluate an employee before job protections attach, making separation more difficult and costly; and (4) greater uncertainty and legal risks with regard to terminating employees with the shifting of evidentiary burdens and statutes of limitations in the employee's favor.  By increasing the costs, uncertainties, and risks associated with creating new jobs and hiring new employees, it is self-evident Act 41 can only discourage employers from hiring new employees and expanding their businesses.

**E.  THE GOVERNMENT PROVIDES A DEFICIENT § 204(a) SUBMISSION FOR ACT 41**

60.    On June 28, 2022, the Department of Labor and Human Resources ("Department of Labor" or "DOL") published "Opinion of the Secretary 2022-01" providing interpretive

guidance regarding the application of the probationary period in Act 41.  A certified translation of Opinion of the Secretary 2022-01 is attached hereto as Exhibit 20.

61.     On June 29, 2022, the Governor submitted Act 41 along with the Government's PROMESA § 204(a) submission for Act 41 (the "Submission"), which consisted of AAFAF's certification (the "Certification") and three attachments:  Attachment A, consisting of a "Fiscal Impact Certification" by the Office of Management and Budget ("OMB") and a certification by the Department of Labor; Attachment B, containing a certification by the Department of Treasury; and Attachment C, containing an undated report prepared by the consulting firm DevTech Systems, Inc. (the "DevTech Report").  A true and correct copy of the Submission—including the Certification, Attachment C, and certified translations of Attachments A and B—is attached hereto as Exhibit 21.

62.     The Submission lacked a formal estimate of the impact Act 41 will have on the expenditures and revenues of the Commonwealth.  Instead, the Submission included statements that covered the wrong time period, focused on the budget instead of the 2022 Fiscal Plan, were conclusory, devoid of substantive analysis, and failed to address Act 41's impact on Commonwealth revenues in any detail.

63.     For example, in Attachment A, the OMB stated "[a]fter the corresponding evaluation and analysis, we conclude that the aforementioned piece of legislation should not entail a fiscal impact and, if any, it would be minimal for the approved budget for fiscal year 2021-2022." Certification, Attachment A at 1.  Fiscal year 2021-2022 ended on June 30, 2022, and Act 41 did not take effect until July 20, 2022.  Moreover, the "evaluation" that OMB attached to its certification was a two page "Universal Form" prepared by the *Department of Labor* finding, after conducting an analysis of the Act's impact solely on "the Agency," *i.e.* the "Department of Labor

and Human Resources," the statute *does* "entail[] a fiscal impact." *Id.* at 2. Like the OMB's certification, the Department of Labor's evaluation focused on the "certified budget for fiscal year 2021-2022." *Id.* The Department of Labor's evaluation did not reference the 2022 Fiscal Plan, nor did it analyze the time period during which Act 41 would be in effect. Finally, as the narrow scope of the Department of Labor's analysis makes clear, the Department of Labor did not provide a formal estimate of a law's impact on the Commonwealth's revenues and expenditures.

64.     Attachment B is even more conclusory, stating "the statute before [the Department of Treasury] entails no fiscal impact" on "the certified budget for fiscal year 2021-2022." Certification, Attachment B at 1. Nowhere in Attachment B is there any explanation of how the Department of Treasury came to this conclusion. Nowhere does the Department of Treasury explain why it analyzed the impact of Act 41 on the fiscal year that ended on June 30, 2022 even though Act 41 did not become effective until July 20, 2022.

65.     The Submission also lacked a proper certification under PROMESA.

66.     AAFAF provided the Certification even though AAFAF did not prepare a formal estimate. In addition, AAFAF's Certification fails to certify the Act is, or is not, significantly inconsistent with the 2022 Fiscal Plan. Instead, AAFAF equivocates, stating only that "[o]ne *may conclude* Act 41 is not significantly inconsistent with the Fiscal Plan" and "one *can* conclude Act 41 is not significantly inconsistent with the Fiscal Plan." Certification at 7, 11 (emphases added).

67.     The Attachments also fail to certify whether the Act is, or is not, significantly inconsistent with the 2022 Fiscal Plan. The Department of Treasury did not complete the section certifying the statute is, or is not, significantly inconsistent with the 2022 Fiscal Plan. Certification, Attachment B at 1. Even though the Department of Labor's certification included in Attachment A

certifies that Act 41 is not significantly inconsistent with the fiscal plan, the Department of Labor's analysis is limited solely to the impact on the Department of Labor and its analysis was limited to Act 41's impact on the "fiscal year 2021-2022 budget"—not the 2022 Fiscal Plan and not the applicable budget when Act 41 became effective.

68.    AAFAF's Certification is defective in part because it is based on the defective conclusions of OMB, the Department of Labor, and the Department of Treasury.   Indeed, section IV of AAFAF's Certification, entitled "Fiscal Impact," states "the Office of Management and Budget certified that implementation of Act 41 will not have a fiscal impact on the Certified Budget.  In regards to revenues, the Department of Treasury certified that Act 41 does not have an impact on revenues."  Certification at 11.  As Attachment A makes clear, OMB analyzed the impact of Act 41 on the fiscal year 2021-2022 budget, even though Act 41 did not take effect until July 2022 after the start of fiscal year 2022-2023 on July 1, 2022.  Certification, Attachment A at 1.  Similarly, as Attachment B makes clear, the Department of Treasury analyzed the impact of Act 41 on the fiscal year 2021-2022 budget, not the fiscal year 2022-2023 budget—which was in effect when Act 41 became effective.  AAFAF Certification, Attachment B at 1.  Because AAFAF's Certification is based on Attachment A and Attachment B, which are defective, AAFAF's Certification is defective.

69.    On July 15, 2022, the Department of Labor issued a notice of proposed rulemaking in connection with three proposed regulations implementing Act 41.  A true and correct copy of the notice of proposed rulemaking is attached hereto as Exhibit 22.  Specifically, the Department of Labor has published proposed drafts for regulations interpreting Act 379-1948, which include provisions related to the work hours and days in Puerto Rico; interpreting Act 80-1976, which regulates aspects related to unjust terminations and the indemnity payment; and regarding

24

Act 148-1969 related to the Christmas Bonus.  With the publication of the notice of proposed rulemaking, the Department of Labor accepted comments from private citizens to the proposed drafts for a 30-day period.

70.     On July 19, 2022, pursuant to PROMESA § 204(a)(3), the Oversight Board notified the Governor, the Legislature, and AAFAF the Submission was defective.  The Submission was not accompanied by the formal estimate required by PROMESA and was not accompanied by a proper certification.  A true and correct copy of the Oversight Board's July 19, 2022 letter is attached hereto as Exhibit 23. Pursuant to PROMESA § 204(a)(4), the Oversight Board directed the Governor to provide the missing formal estimate and certification.  July 19 Letter at 3-9.

71.     As a result of the Government's failure to provide any meaningful analysis of Act 41's impact, the Oversight Board advised the Government to "fully suspend the implementation and enforcement of Act 41 such that it has no applicability to any private employer at least until the Government and the Oversight Board have fully exchanged their views concerning Act 41 and the Oversight Board changes its determination regarding the Act's impact on the purposes of PROMESA." *Id.* at 9.

72.     Also on July 19, 2022, the Secretary of the Department of Labor published "Opinion of the Secretary 2022-02," providing interpretive guidance regarding certain employer classifications for micro, small, and medium-sized businesses in connection with Act 41's provisions, and "Opinion of the Secretary 2022-03," providing interpretive guidance regarding implementation of Act 41 in connection with the criteria for vacation and sick leave accrual for certain part-time employees.  Certified translations of Opinion of the Secretary 2022-02 and Opinion of the Secretary 2022-03 are attached hereto as Exhibits 24 and 25, respectively.

73.     On July 22, 2022, AAFAF responded to the Oversight Board's July 19, 2022 letter. A true and correct copy of AAFAF's July 22, 2022 letter is attached hereto as Exhibit 26. In that letter, AAFAF contested that its Certification was inadequate, but failed to address the Oversight Board's concerns. *Id.* at 1. With respect to the deficient estimate, AAFAF did not contest it had failed to assess the potential impact of Act 41 on the Commonwealth's revenues; rather, it contended any analysis of the Act's fiscal impact would be "an ambitious and expansive undertaking." *Id.* at 1–2. It also communicated the Governor would not suspend the law, contending the Governor was powerless to do so because a law "that regulates private market conduct can only be enjoined by a court order or alternatively suspended pursuant to legislative action, neither of which fall under the Executive Branch's powers."

74.     With its July 22, 2022 letter, AAFAF submitted additional information regarding its certification (the "Supplemental Submission"). A true and correct copy of the Supplemental Submission, including updated certifications from OMB and DOL, are attached hereto as Exhibits 27 and 28, respectively. AAFAF provided an updated certification from the Department of Labor ("Updated DOL Certification"), in which Department of Labor revised its estimate of the costs associated with promulgating implementing regulations. Ex. 28 at 1.

75.     The Oversight Board evaluated the Supplemental Submission and concluded that the Government had failed to address the Oversight Board's concerns, as stated in its letter dated July 19, 2022. The Department of Labor's revised certification did not estimate the impact Act 41 would have on Commonwealth revenues as a whole and remained limited to its impact on "the Department of Labor and Human Resources" and "whether [Act 41] may have a potential fiscal impact on the Expenditure of the Government of Puerto Rico." *Id*. Once again, the Department of Labor's revised certification focused on the impact on the "certified budget for the fiscal

year 2021-2022," *id.*, even though the Oversight Board had specifically pointed out in its letter

dated July 19, 2022 that the Government's certification focused on the wrong time period, July 19

Letter at 3.  Based on that meaningless analysis that was limited to the agency, the Department of

Labor certified that Act 41 "is not [significantly] inconsistent with the Certified Fiscal Plan."

Updated DOL Certification at 2.  Nowhere did the Department of Labor evaluate or analyze the

impact of Act 41 on revenues or expenditures for the time period when the Act is effective (i.e.,

on and after July 20, 2022).  As such, the Department of Labor's certification that Act 41 is not

significantly inconsistent with the "Certified Fiscal Plan" is defective.

76.     On July 29, 2022, the Oversight Board met with its advisors and its economic

consultant, Dr. Triest.  At that meeting, Dr. Triest presented to the Oversight Board his analysis

regarding the economic impacts of Act 41 after considering the Government's Submission,

July 22, 2022 letter and Supplemental Submission.  Based on its discussion with Dr. Triest and its

general knowledge, the Oversight Board agreed with Dr. Triest's conclusions that Act 41 (*i*) will

lead to decreased formal labor market participation; (*ii*) will "negatively impact[] . . . GNP growth,

market competition, and corresponding tax revenues;" (*iii*) will create uncertainty for the market;

and  (*iv*) will "discourage new hiring and will significantly reduce the [EITC] expansion's

effectiveness."  July 29, 2022 Presentation by Dr. Triest ("Triest Presentation") at 2, a true and

correct copy of which is attached hereto as Exhibit 29.

77.     In addition, the Oversight Board determined that the Submission and Supplemental

Submission were defective.

78.     The next day, July 30, 2022, the Oversight Board responded to AAFAF's

July 22, 2022 letter.  In its July 30 letter, the Oversight Board responded to the various arguments

made in AAFAF's July 22 letter, noting that AAFAF had failed to remedy the deficiencies in the

Submission identified by the Oversight Board in its July 19, 2022 letter and reiterated its determination that Act 41 would impair or defeat PROMESA's purposes in violation of PROMESA § 108(a). July 30 Letter at 1, a true and correct copy of the July 30 Letter and its Exhibit are attached hereto as Exhibit 30. In an effort to avoid litigation, the Oversight Board offered a compromise, requesting the Governor "promptly consent to a simple order suspending Act 41 while the parties further discuss the issues." *Id.*

79.      With its letter, the Oversight Board shared the presentation by its economist, Dr. Triest, made to the Oversight Board on July 29, 2022 addressing the economic impact of Act 41, and invited the Government to provide its own economic analysis of the Act so that the Oversight Board could consider it in evaluating the law. *Id.*

80.      AAFAF responded in a letter dated August 4, 2022. Letter from AAFAF to the Oversight Board dated August 4, 2022 ("AAFAF's August 4 Letter") at 1, a true and correct copy of which is attached hereto as Exhibit 31. AAFAF rejected the Oversight Board's proposed temporary solution to enter into an order to preserve the status quo. *Id.* at 2–3.

81.      AAFAF's August 4 Letter did not correct the Government's failure to prepare a formal (or informal) estimate of the impact of Act 41 on the Commonwealth's revenues, contending such an analysis would be "a complex and difficult task." *Id.* at 3. Instead, it suggested Act 41 be allowed to go into effect and, at some point in the future, measure its effects and potentially amend the law or revise the fiscal plan to reflect the lower revenues. *Id.* at 2.

82.      Based on the Government's Submission, Supplemental Submission, and letters to the Oversight Board, the Government intentionally focused on the "impact" of Act 41 on the fiscal year 2021-2022 budget—and not the impact on fiscal years 2022-2023 (and subsequent years)—because the Government had not analyzed the impact of Act 41 on the Commonwealth's budget

for the years when the law would be in effect.  In other words, the Government's certification of "no fiscal impact" is meaningless because Act 41 was not in effect during fiscal year 2021-2022, and the Government did not analyze *or certify* its impact for later fiscal years when the Act is in effect.

83.     On August 12, 2022, the Oversight Board again met with its advisers and Dr. Triest to discuss AAFAF's response to the Oversight Board's letters.  Dr. Triest presented his analysis of AAFAF's responses, explaining why AAFAF's letters and materials failed to change his conclusions regarding the economic impact of Act 41.  A true and correct copy of Dr. Triest's August 12, 2022 presentation ("August Triest Presentation") is attached hereto as Exhibit 32.

84.     At that meeting, the Oversight Board approved a resolution affirming its prior conclusions regarding Act 41, directing the Governor to refrain from implementing the Act; advising the Governor that "the only way to avoid litigation is for the Governor to stipulate to an order suspending Act 41-2022"; and approving "taking legal action against the Government and other appropriate parties, pursuant to its authority under PROMESA."  A true and correct copy of the Oversight Board's August 12 resolution (the "August 12 Resolution") is attached hereto as Exhibit 33.

85.     On August 22, 2022, the Secretary of the Department of Labor published a public notice notifying a new email address and the publication of a form for employers to notify the extension of the probationary period in compliance with Act 41.  A true and correct copy of the August 22, 2022 public notice is attached hereto as Exhibit 34.[7]

---

[7] As of the filing of this Complaint, an official certified English translation of the August 22, 2022 public notice was not available.  Contemporaneously herewith, the Oversight Board will file a motion seeking leave to obtain and submit a certified English translation of August 22, 2022 public notice.

86.     On August 23, 2022, the Oversight Board sent a final letter to AAFAF reiterating its concerns and informing the Government of the Oversight Board's August 12 Resolution.  A true and correct copy of the Oversight Board's August 23, 2022 letter is attached hereto as Exhibit 35.  In that letter, the Oversight Board notified the Government that the deficiencies in the Government's Submission and Supplemental Submissions were not remedied by AAFAF's August 4 Letter.  *Id.* at 1.  The Oversight Board's letter also repeated its concerns that the Government has no basis to reach a conclusion regarding the Act's consistency with the 2022 Fiscal Plan because the Government has not provided a formal estimate of the Act's impact on revenues.  *Id.* at 2.  The letter also explained AAFAF's August 4 Letter provided "no data, statistics, economic studies, logic, or other information to support" the Government's contention that Act 41 will "translate into potential greater consumer spending and increased revenue for the Government." *Id.* at 2.  As the letter explained, the Oversight Board engaged Dr. Triest to analyze AAFAF's August 4 Letter to "ensure it fully considered the Government's position," and he concluded, in summary, that "(*i*) the Government's August 4 letter did not offer any new evidence to change his economic analysis, and (*ii*) the Government's assertions in the letter did not change his economic analysis." *Id.* at 4.

87.     The Oversight Board reiterated the proposal in its July 30, 2022 letter (which the Government had already rejected); namely, to consent to a simple order suspending Act 41 while the parties further discuss the issues raised by Act 41.  As of the date of this filing, the Government had not responded to the Oversight Board's letter dated August 23, 2022.

## COUNT I

### NULLIFICATION AND INJUNCTION BARRING
### IMPLEMENTATION OF ACT 41
### (PROMESA §§ 108(a)(2) AND 104(k))

88.     The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 87 above as if set forth in full herein.

89.     PROMESA § 108(a)(2) bars the Governor and the Legislature from enacting, implementing, and enforcing any law the Oversight Board determines would impair or defeat the purposes of PROMESA.

90.     After being advised of the Oversight Board's determinations in respect of Act 41, the Legislature and Governor enacted Act 41 in violation of PROMESA § 108(a)(2).

91.     The Oversight Board is entitled to an order nullifying Act 41 because the Government enacted it in violation of the statutory bar in PROMESA § 108(a)(2).

92.     On June 18, 2022 and July 19, 2022, the Department of Labor published interpretive guidance regarding the implementation of certain provisions in Act 41.   On July 15, 2022, the Department of Labor issued a notice of proposed rulemaking in connection with three proposed regulations implementing Act 41.  Similarly, on August 22, 2022, the Department of Labor issued a notice related to the process for employers to inform extensions to employees' probationary period.  Act 41's provisions, however, are enforced by private citizens.

93.     PROMESA's purposes include providing a method for the Commonwealth to achieve fiscal responsibility and access to capital markets.  *See* PROMESA §§ 101(a), 201.

94.     The Oversight Board determined Act 41 impairs and/or defeats PROMESA's purpose of achieving fiscal responsibility by discouraging new hiring, reducing labor market

flexibility in direct contravention of the Fiscal Plan, reducing economic growth, and reducing the Commonwealth's revenues.

95.     Specifically, Act 41 purports to repeal labor reforms the Fiscal Plan expressly directs not be undone and creates additional mandatory employment benefits that contradict the Fiscal Plan's directives.

96.     Further, passing a law with such wide-ranging impacts on the entire private labor workforce without conducting an analysis of the impact the law will have on the Commonwealth's revenues is reckless, contrary to PROMESA § 204(a), and the antithesis of fiscal responsibility— one of PROMESA's purposes.

97.     Another purpose of PROMESA is to ensure that the new laws are not significantly inconsistent with the fiscal plans, which could hinder the achievement of fiscal responsibility and access to capital markets.   The Government's certification that Act 41 is not significantly inconsistent with the 2022 Fiscal Plan is defective because it is based on defective certifications of "no fiscal impact" by the OMB, Treasury, and Department of Labor.  The certifications of OMB, Treasury, and Department of Labor were limited to the impact of Act 41 on the fiscal year 2021-2022 budget, and failed to assess the impact of the law on the Commonwealth's revenues.  Act 41 could not have an impact on the fiscal year 2021-2022 budget because fiscal year 2021-2022 ended on June 30, 2022 and Act 41 did not become effective until July 20, 2022. Despite the Oversight Board's repeated requests, the Government did not analyze the impact of Act 41 on revenues and expenditures for any time period during which the law will be in effect.

98.     In addition, the provisions of Act 41, which increase the costs and risks of hiring and firing employees, can only discourage hiring, thereby reducing labor force participation,

economic growth and Commonwealth revenues, contrary to the 2022 Fiscal Plan and the Plan of Adjustment.

99.     The Oversight Board engaged its own economic advisor and determined Act 41 will reduce economic growth and Commonwealth revenues without any identified method of making up the lost revenue.

100.    The Oversight Board notified the Governor of its determination that Act 41 would impair and/or defeat PROMESA's purposes and directed him not to enact or implement the law.

101.    Notwithstanding the Oversight Board's determinations and directives, the Governor signed Act 41 into law.

102.    PROMESA § 108(a)(2) statutorily barred the Government from enacting or implementing Act 41 once the Oversight Board determined the Act impaired and/or defeated the purposes of PROMESA.   Despite knowledge of the Oversight Board's determination, the Governor signed Act 41 into law in violation of PROMESA § 108(a).

103.    Because Act 41 has a private enforcement mechanism, the only way to prevent implementation and enforcement of Act 41 is to nullify the law.

104.    The Oversight Board is thus entitled to an order pursuant to PROMESA §§ 104(k) and 108(a)(2) nullifying Act 41.

**<u>COUNT II</u>**
**NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 41**
**(PROMESA § 204(a))**

105.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 104 above as if set forth in full herein.

106.    PROMESA § 204(a)(1) requires the Governor to submit to the Oversight Board new legislation within seven business days of its enactment, and § 204(a)(2) requires the Governor

33

to include with the submission a formal estimate of the law's impact on the Commonwealth's expenditures and revenues prepared by an "appropriate entity" with expertise in budgets and financial management and a certification by that entity of whether the law is or is not "significantly inconsistent" with the certified fiscal plan.

107.    Pursuant to PROMESA § 204(a)(3)(A), the Oversight Board notified the Governor, the Legislature, and AAFAF that the Submission was not accompanied by a "formal estimate prepared by an appropriate entity of the [Puerto Rican] government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues." PROMESA § 204(a)(2)(A).   Specifically, the Oversight Board notified the Governor, the Legislature, and AAFAF that (*i*) the estimate was not prepared by an appropriate government entity; and (*ii*) the estimate did not address the Act's impact on Commonwealth revenues.

108.    Pursuant to PROMESA § 204(a)(3)(B), the Oversight Board notified the Governor, the Legislature, and AAFAF that the Submission did not include a proper certification that the law is or "is not significantly inconsistent with the Fiscal Plan."  PROMESA § 204(a)(2)(B), (C).  As the Oversight Board explained in its July 19 Letter, this requirement was not met because, among other things, AAFAF's Certification merely stated that "one may conclude" that the Act was "not significantly inconsistent" with the 2022 Fiscal Plan, and the Department of Labor's certification was limited to the impact of the law on that agency.  *See id.* ¶ 108.

109.    In addition, the AAFAF's certification that Act 41 is not significantly inconsistent with the 2022 Fiscal Plan is defective because it is based on defective certifications from the OMB, Treasury, and Department of Labor.  AAFAF's Submission and Supplemental Submission were also defective because the Government did not estimate the impact of Act 41 on revenues and expenditures of the Commonwealth for any time period during which the Act is in effect.

110.    Pursuant to PROMESA § 204(a)(4)(A), the Oversight Board directed the Government to provide the missing estimate and certification.  *See* July 19 Letter at 6, 9.  The Government failed to provide the missing estimate or certification, contending its certification was sufficient and preparing a formal estimate of Act 41's impact on the Commonwealth's revenues would be too "complex and difficult [a] task."  *See* AAFAF's August 4 Letter.  The Government thus failed to comply with PROMESA § 204(a) and with the direction given by the Oversight Board pursuant to PROMESA § 204(a)(4)(B).

111.    The Government has refused to enter into a stipulation suspending Act 41 until the parties could attempt to resolve their disagreements.

112.    Act 41 is directly contrary to the certified Fiscal Plan and its enactment adversely affects the Commonwealth's compliance with the certified Fiscal Plan.  The certified Fiscal Plan provides the LTFA should not be repealed and no new legislation that negatively impacts labor market flexibility shall be enacted.  Act 41 violates both of these directives.

113.    The Oversight Board engaged its own economic advisor and determined Act 41 will reduce Commonwealth revenues without any identified method of making up the lost revenue.  As such, Act 41 violates the certified Fiscal Plan's revenue neutrality principle, as it decreases revenues without corresponding offsetting revenue increases or spending cuts.

114.    The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k) and 204(a)(5) nullifying the Act to ensure the law will not adversely affect the Commonwealth's compliance with the certified Fiscal Plan.

## **PRAYER FOR RELIEF**

WHEREFORE the Oversight Board prays that judgment be entered for it and against Defendant, and for the following relief:

A.      That each claim be sustained;

B.      That Act 41, and any actions taken to implement the Act, be nullified *ab initio*;

C.      Defendant is permanently enjoined from taking any acts to help private parties implement Act 41;

D.      Granting Plaintiff such other and further relief as the Court finds just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 1, 2022
San Juan, Puerto Rico

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email:
hermann.bauer@oneillborges.com

/s/ Martin J. Bienenstock
Martin J. Bienenstock (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
Julia D. Alonzo (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
           tmungovan@proskauer.com
           jalonzo@proskauer.com

/s/ Guy Brenner
Guy Brenner (*pro hac vice*)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel:     (202) 416-6800
Fax:     (202) 416-6899
Email:  gbrenner@proskauer.com

*Attorneys for the Financial Oversight
and Management Board in its own
right and as representative of the
Commonwealth of Puerto Rico*